Good morning and please be seated. Judge Gould and I are happy to welcome our colleague Judge Battaglia from the Southern District of California who's sitting with us by designation and has done so before. Judge Gould, can you hear us? Yes, I can hear you perfectly. Thank you. First case for argument this morning, relocation. Good morning, Your Honors. Brian Toth from the Department of Justice, representing the appellant, the Office of Navajo & Hopi Indian Relocation, which I'll refer to as ONER by its acronym. I'd like to reserve the floor. I had an acronym in my head, but I was pronouncing it differently, so I'll go with yours. I'll try to sit down with three minutes on the clock. All right. The district court erred in two main respects here. First, it applied the incorrect legal standard for determining whether the applicant is a resident of the Hopi Partition lands at the time that she became self-supporting in August of 1983. And second, under the correct standard, the district court should have concluded that the agency's decision was supported by substantial evidence and, therefore, must be upheld. Turning first to the correct legal standard, the district court said that the standard was merely one of substantial and recurring context. That is simply incorrect. The same district judge a year later in the Jackson case that we cited in our reply 8 and 9, a case that is on appeal, rejected the standard of merely one substantial and recurring context, and instead applied what we believe is the correct standard, relying on the legal residence test in the 1984 regulation, which refers to the preamble to that regulation, focusing on the intent to reside and manifestations of that intent. So we believe that using that proper standard, the district court should have upheld O'Neill's decision because a rational fact finder could have concluded that the applicant did not intend to reside and had not objectively manifested that intent as of August of 1983 when she became self-supporting. And there are a number of factors that, in the record, that objectively support that conclusion, but I'll focus on two in particular that the hearing officer relied on. Now ---- Ginsburg-Morrison, and in this case, my understanding is that Ms. Charles doesn't disagree with you on the standard. Is that right? That's my understanding. We'll ask, but ---- Yes. I mean, if we could talk about the role of substantial contacts, you know, post-1984 when that provision was eliminated from the regulation, but, you know, I'll focus on the record, unless the Court has particular questions on how those standards interact. You know, I think that it may help for the Court to focus on the regulation at 25 CFR 700.69a2, which is actually, it's not the definition of residence, but it's the definition of household, for the term head of household. And it says that a single person who at the time of her residence on land partitioned to the tribe of which she's not a member actually maintained and supported herself. So that's where residence comes into play. It's looking at residence as of the time she actually maintained and supported herself, which here, I think it's undisputed that it was as of August of 1983 when she received Federal grants to go to college. There is no evidence in the record that she actually resided on the Hopi partition lands beginning in August of 1983 and later after she went to college. So, you know, she has not presented the evidence that she was actually maintaining and supporting herself while she resided on those lands. Now, she relies on these summertime visits and weekend visits to TSA, to Visto, to visit her family while growing up. But the hearing officer relied on two main factors on page 194 of the excerpts of record. First, the applicant's family's residence at the trailer in Many Farms, and then second, together with the applicant's enrollment in the Many Farms chapter for purposes of voting. Now, the district court erroneously said that the hearing officer had only relied on a single event, meaning the selection of the Many Farms chapter for where she would be registered. But in fact, the hearing officer's decision relies on the applicant's longtime residence in Many Farms at the trailer where her, that was owned by her dad's aunt and where the family resided for a dozen years or so while she was growing up, while she went to school on a daily basis, while she went to high school in the nearby town of Chinle. And so that was enough evidence in the record to support a rational conclusion that she did not intend to reside elsewhere when she went off to college in August of 1983. Furthermore, the hearing officer relied on the decision that the applicant made to register with the Many Farms chapter, which would mean that was where she would get to vote. This made sense. You know, she explains it as, well, this was just a practical decision. It's where I could obtain grant money better than registering with a chapter where her maternal aunt lived. But regardless, I mean, I think there was a — that hearing officer was reasonable in relying on the applicant's choice when she became 18 to make that decision, make that election on her own, and to live with the legal consequences of that, both in terms of college financing and in terms of these government benefits for relocation. In addition, there are other objective facts that support the hearing officer's decision that, you know, were mentioned in his decision but not expressly relied on in his, you know, the final page of his decision. The applicant was residing — she was employed part-time during school in Many Farms. She — there's evidence in the record that she was working at a job in the mornings before going to school, and that she was working on winter breaks there as well. The — you know, the argument that the applicant makes is that the office had to treat her identically to her mother, who did also receive benefits, and, according to the applicant, had the same patterns of residency while the applicant was growing up, I think that — that argument should be rejected on several — several different grounds. First of all, the benefits that were awarded to the applicant's mother, Juanita Charles, were awarded through a settlement decision, and they were not supported by a detailed set of findings of fact that the award were supported by the adjudication. The hearing officer actually did make detailed findings of fact denying her benefits, and it was only after litigation that the agency settled the case and decided to award her benefits. But I don't think the agency's stopped for all purposes and forced to square every factual aspect of this case with what we could hypothesize might have been the facts there supporting the award of benefits because there simply weren't such facts. Do you want to save the remaining time? Yes, Your Honor. Thank you. May it please the Court. Katie Jones for Appellee, Ms. Charles. You just heard a great deal about all of these residents at — at many farms rather than in Tistot. But it's — we need to remember what the baseline is that we're starting with. The hearing officer explicitly found at ER 202, paragraph 2, that she was a legal resident of Tistot until March 11, 1983. And the parties also agreed to that fact at ER 58 through 59, and O'Neill admitted to that in its post-hearing brief at — at ER 131 and 132. So we're not starting from scratch here. A minor's domicile is derivative of her parent's because minors are considered legally incapable of choosing their own domicile. And when a person obtains majority, you don't start from scratch. You're — there's already a baseline. So under that baseline, she was already a legal resident of the Hopi partition lands, the HPL. Under domicile law, there is something that she had to affirmatively act to change that residency. And — Wouldn't registering at many farms be that affirmative act, an expression of intent to change domicile? Well, there — under no conception of any — an American law of legal residency, it does — voter registration alone mean that that's an intent to change your domicile. What constitutes substantial evidence depends on the nature of the case that — the question that a case involves. And focusing on one piece of evidence may be sufficient for some cases, but the nature of — of residency is that you can't consider isolated factors. As I said, there's just no conception in American law that allows for just one factor. Instead, it requires a balancing of all the evidence. But doesn't that prove the case here ultimately? The district court focused on, it would I mean, isn't it — from the get-go, isn't the district court in error in the test it chose to apply? So the — the district court, under the APA standard, made its determination on the totality of the circumstances, or on the entire record, as it was meant to do under the APA. And I would like to — counsel mentioned the — the standard, and we want to be very clear. We do not — our position, we agree that intent is required. But substantial and recurring contacts and intent are not mutually exclusive. Rather, substantial and recurring contacts can manifest a person's intent to reside at a particular place. And in this case, we have both of those. First, Ms. Charles' contacts with the HPL returning every weekend, holiday specifically, during the summer of 1983, manifest her intent to maintain her residency there. And then second, she specifically testified as to what her intent was, and the hearing officer found that intent to be credible. That's at ER-191. She testified that she received — that she registered for the Many Farms chapter for the sole purpose of receiving scholarships. That's at ER-66. But that during the relevant time period, she considered Tistot her home. That's at ER-66 through 67. And the district court repeatedly recognized what the correct standard was. He repeatedly cited the eligibility regulations and the 1984 preamble. And what he did is he arrived at the same conclusion that O'Neill has settled on for decades, that substantial and recurring contacts are probative of an intent to reside on the HPL. And then, moreover, the district court did not only rely on Ms. Charles' substantial and recurring contacts with the HPL. It relied on her statement of intent that she joined the Many Farms chapter because she could not, I'm quoting, she could not obtain college assistance from Tistot chapter. So that — those are the exact same facts that the hearing officer relied on in his first decision to find that Ms. Charles was a legal resident of the HPL. And nothing in the record changed between the original decision and the revised decision. All that happened was that in response to the government's suggestion that the hearing officer placed dispositive weight on her Many Farms registration to the exclusion of all other evidence and without legal support. And once that legal error is placed aside, the record remains clear that Ms. Charles was an HPL legal resident. And let's look at exactly why that was a legal error. As I already mentioned, the nature of substantial evidence depends on the nature of the question. And the hearing officer here made — made this determination, placed this dispositive weight on chapter membership without any legal authority under either the Settlement Act or domicile law generally. And there's just — there's just — when you look at domicile law and the APA, there's no single fact is supposed to be controlling. You're supposed to look at the totality of the circumstances. And I like — Ginsburg. So I think the hearing officer said as follows that the seminal event that transfers legal residence, and she falls into it, electing to become a member of the Many Farms chapter, which eliminated her claim to legal residence in TITSO from that time forth. Do you disagree with that? So we disagree that the fact that she — that — that the chapter membership should have had that dispositive weight. If you look at — so remember, we have to start at the baseline. On March 11th, 1984 — or 1983, she was a legal resident of TITSO. And after that, she continued the same residency pattern that she had for her entire life. She returned every weekend, holiday, and then specifically in the summer of 1983, she returned to — to her — to her — to her home in TITSO. And there's nothing else that changed that — that shows that she made an affirmative act to change her legal residency. And I'd like to go to the point that counsel pointed out about 25 CFR 769a2, the argument that she was not — that she was not a head of household while she was a legal resident of TITSO. So this argument points to the difference between physical occupancy and legal residence. And you need — as I've said, you need an affirmative act to transfer legal residence. And going away to college is a classic example of being temporarily away. You're just simply changing your physical location. And the government is arguing that there — we need to remand or we somehow need to show exactly when she relocated from the HPL. But all the regulations and the law required Ms. Charles to prove was that she was an HPL legal resident on December 22nd, 1974, and that she became a head of household while she was still an HPL legal resident. And we know that she relocated sometime after that because while she was away in college, the deadline to relocate — for all Navajo residents to relocate from the HPL, that was July 7th, 1986. So after that time, it was not possible for her to return to the HPL as a legal resident. She — under Navajo matrilineal customs, she was supposed to return to her mother's home. And after that, she was not able to do so. And let's look to the mother's circumstances that — that show that this was an art — placing dispositive weight on chapter residence — chapter membership was arbitrary and capricious. As I'm sure Your Honors are well aware, consistent treatment is required by the APA. The hearing officer cannot dispart from standards that it's already had. And the mother — the government admitted to the district court that the mother, when she was found to be a TISTO resident in 1974, she was also — this is at ER 220 at Note 7 — that she was a Many Farms Chapter member. She was a Many Farms Chapter member, so just like her daughter was, and she also had this similar residency pattern. So that further shows that the hearing officer invented this disqualifying distinction without any legal support. Thank you. Thank you. Thank you, Your Honors. Thank you. So I'd like to respond to a couple of the points. But first, I want to remind the Court of the standard group review of substantial evidence. It doesn't mean that the the correct conclusion is. It simply entrusts the agency with the role of making that decision in the first instance. And so long as that decision is based on a rational view, a rational view of the facts, it should be upheld. So first, this notion that the baseline is beginning in the spring of 1983, the agency did stipulate that on the prior to that date. But I don't think that stipulation prevents the hearing officer from looking at her pattern of daily residence while she was growing up. Certainly, you know, just as her weekend visits continued, her pattern of daily residence in the spring of 1983 through her graduation continued. She was still going daily at the high school in Chinle. She testified she worked It was employed in the mornings there in the many farms area. So I don't think the hearing officer is precluded or this Court is precluded from looking at the pattern that continued from her day-to-day life in many farms simply because of that stipulation. As to the statement that there had to be an affirmative act to change domicile, you know, this is analogous to domicile law in some ways, but this statute and these regulations are really their own creatures and they have to be taken on their own terms. And so I would urge the Court not to adopt too many of the very specific principles of domicile law. There's nothing in the regulations or the regulatory preamble that says, you know, there's a presumption of some sort once a domicile is established or once residency is established. And, in fact, the burden is placed by the regulations upon the applicant to show residence. And the date and question that's at issue here is, you know, it's in this Regulation 700.69a2, the time when she legally supported herself. So I'd urge the Court to look to the regulations for the standards and not to the analogous principles in domicile law. And unless the Court has any further questions, we would ask that the district court's decision be reversed and that the agency's denial of benefits be affirmed. Roberts. I guess I have one quick question, and that is, Ms. Jones talked about the head-of-household concept as having been contemporaneous with majority virtually. Do you agree? Reaching the age of majority without showing more? Not necessarily. I think the agency looks to the income as a preliminary matter, and perhaps you'll hear more in the next case where that's directly at issue. But I don't think it's simply reaching the age of 18. You have to show that you actually supported and maintained yourself. Okay? Thank you. I thank both counsel for your argument this morning.
judges: McKeown, Gould, Battaglia